IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 1:18-CV-2320-RM

LINDA HARLAS

      Plaintiff,

v.

THE BARN, LLC, a Colorado Limited Liability Company, M and R Enterprises, LLC, a Colorado Limited Liability Company; Catherine Haigh, an individual

      Defendants.

---

## DECLARATION OF CATHERINE HAIGH

STATE OF California    )
                                 )ss
COUNTY OF Riverside   )

### GENERAL BACKGROUND

1. I am an individual who resides in the State of California.

2. I am the sole member and manager of M and R Enterprises, LLC. I have been the sole member and manager since approximately August of 2001.

3. I am the sole member and manager of The Barn LLC. I have been the sole member and manager since approximately April of 2009.

4. M and R Enterprises owns the following real property:

5. Lot 1 Block 21 Town of Castle Rock 4th Amendment

which is commonly referred to as 400 Third Street, Castle Rock, Colorado ("Premises").

6. The physical structure located on the Premises is an old lumber barn which is located next to the railroad in downtown Castle Rock.

7. The physical structure is commonly known as The Barn Antiques and Specialty Shops ("The Barn").

1

ATTACHMENT F
OSUMF
1

8. The Barn is similar to an antique shop where tenants lease space and retail merchandise. This arrangement is commonly referred to as an "open-air mall."

9. In The Barn's case, tenants lease space where they sell home décor, specialty items and some antiques.

10. The Barn LLC is a commercial entity that leases The Barn from M and R, LLC and provides landlord services to the tenant/merchants who have leased space at The Barn.

## THE BARN LLC AS COMMERCIAL LANDLORD

11. Tenant/merchants lease space at The Barn on a month-to-month basis. Rent, for each month, is due on the last day of the prior month. The Barn or the tenant/merchant may decide to discontinue the lease arrangement by either not paying rent when due or by notice to the tenant/merchant that the tenant/merchant's lease will expire within 30 days.

12. Until February 2018, the lease arrangement between The Barn LLC and tenant/merchants was not reduced to writing (because the lease term was a month-to-month term). In 2018, for insurance purposes, The Barn LLC was required to have written leases on file with each tenant/merchant. The written leases created in 2018 mostly reflected the lease agreement between the tenant/merchants.

13. The tenant/merchants pay rent by way of a base monthly rental and then a percentage of commissions (has varied over the years) as well as have exchanged time operating the cash register on behalf of the other tenants. Time operating the cash register has been casually referred to as "work days." Tenant/merchants' time at operating the cash register varies based on the amount of square footage a tenant/merchant leases from The Barn LLC.

14. Throughout The Barn's history, tenants have coordinated with each other in scheduling days that each tenant/merchant would cover the three cash registers located in The Barn. They arrange among themselves when each will cover the three cash registers. Presently, they meet once a month. Lorraine Devins, a current tenant/merchant, takes the lead in calendaring each tenant/merchant's days to operate the cash register. This process involves tenants drawing a number (a lottery) and then when their number comes up, they approach Ms. Devins and pick a day. They repeat this process until all days have been scheduled. The Barn LLC does not participate in this process and Lorrain Devins is not paid or supervised by The Barn LLC to perform this activity.

15. In addition to paying rent, tenants have paid "operating fees" which has been a fixed amount and/or has been a percentage of sales. The operating fees pay for each tenant/merchants' share of utilities, maintenance, bags, cash register (a computer), point-of-sales software system, security system and other similar items. The tenant/merchants also cover processing expenses associated with payments made by their customers with a credit card. Prior to February 2017, the operating fees were set as a fixed dollar amount based on the square footage leased by each tenant/merchant. Those who leased larger spaces paid a greater operating fee. Those with smaller spaces paid a lower operating fee. In early 2013, the commission percentage was increased from

3% to 5%. In 2017 the operating fee became completely variable as sales were high enough to justify this transition. The fixed operating fee was then abolished.

16. The percentage calculation of the operating fee was viewed as more equitable as those who sold more would cover a share of the operating fee proportionate to their higher sales volume while those who sold less would pay an operating fee proportionate to their lower sales volume.

## MANAGEMENT OF THE BARN

17. Over the course of time, The Barn has been managed by The Barn LLC directly by its managing member and assisted by an independent contractor.

18. The independent contractor handles, among other items event planning, new tenant applications, maintenance issues, some financial matters and personnel issue as they arise. The independent contractor is free to perform these tasks at her own leisure at home, The Barn or any other location she desires. The independent contractor is paid a flat fee each month for her services. Tenant/merchants have viewed the independent contractor as "the manager." While technically not accurate, the independent contractor does provide some services on behalf of The Barn LLC management that are in nature management services.

19. The Barn LLC and independent contractor have a contract setting forth the relationship. The Barn LLC does not supervise the independent contractor or provide any benefits (e.g. insurance, vacation time, sick days etc). The independent contractor is not required to perform services exclusively for The Barn LLC. The Barn LLC does not provide any training for the independent contractor. The Barn does not provide any tools for the independent contractor.

20. Presently, the independent contractor providing services for The Barn LLC is Amy Smith. Ms. Smith also is a tenant/merchant who operates a business organized with the state of Colorado and referred to as Whitewash, LLC. Whitewash, LLC and Ms. Smith have been with The Barn during the entire time that Plaintiff and her d/b/a "Sunday Afternoon Antiques" ("Sunday Afternoon") have leased space from The Barn LLC. Approximately two years after Plaintiff commenced leasing space at The Barn, Ms. Smith was retained (as an independent contractor) by The Barn LLC.

## PLAINTIFF LEASE HISTORY

21. Plaintiff contacted The Barn LLC regarding leasing a space in The Barn sometime in May 2010. After some conversation between The Barn LLC (and its agents at the time), Plaintiff leased space in the Barn LLC.

22. Plaintiff's rent included a base amount due on the first day of the month (now it is the last day of the month for the month following), a fixed operating expense based on her square footage, a percentage of her sales and her agreement to operate the cash register for four days a month

23. Plaintiff's lease term was on a month-to-month basis and continued on a month-to-month basis until she left The Barn in May of 2018. In her deposition she originally claimed that

she left voluntarily. In her continued deposition she changed her story and claimed that she was evicted. The Barn elected not to renew her month-to-month lease in June 2018 due to Plaintiff's behavioral misconduct.

24. In 2012, The Barn offered to increase Plaintiff's (and other tenant/merchants) rent – from a 3% commission payment to 15% - in order to hire sales staff to assist the merchants. Most tenants/merchants, including Plaintiff declined the offer. They desired reduced rent (3% commission rather than 15%) and to work the cash registers themselves.

25. As a result of this decision by most tenants/merchants, including Plaintiff, the tenant/merchants have enjoyed reduced rent.

26. In February 2017, Plaintiff leased additional space, increasing from 490 square feet to 752 square feet. She agreed to pay base rent at the rate of $3.25 dollars per square foot (she had been paying $2.46 per square feet from October 2015), 5% commission on sales (which included her share of the operating expenses) and to operate the cash register for 8.5 days a month instead of six (6) days a month.

27. It is important to note that as of February 2017, Plaintiff never objected to the Policy and Procedures Manual. She had participated in creating the document (a draft was sent to her before implantation seeking feedback – she approved) and she continued her month-to-month tenancy.

## POLICY AND PROCEDURAL MANUAL

28. In 2012, The Barn LLC began to receive feedback from several tenant/merchants regarding a lack of policies to govern the tenant/merchants' interrelationship at The Barn. Up until that point of time, the tenant/merchants, including Plaintiff, had coordinated among themselves taking turns operating the cash register for each other as well as other tasks necessary for each to operate their retail businesses. This permitted each tenant/merchant to be free to operate their business at other locations, in addition to The Barn, and to travel to various antique shows and/or merchandise markets to purchase more merchandise to sell in the tenant/merchant's space at The Barn. There are approximately 25 to 30 tenant/merchants at a time at The Barn. Approximately four to six of the tenants would volunteer to operate the cash register each day (there are some who are current tenants who have never operated the cash registers). This would allow the other 19 to 24 tenants to be free to operate their business at other locations and/or engage in other tasks to further their respective business interests. Several of the tenants have and/or currently operate at other locations in addition to The Barn.

29. The tenants offered suggestions to address their issues. The Barn LLC began to receive draft procedures and policies describing how to operate the cash register, what to do when at the cash register etc. Wanting to maintain a good relationship with its tenant/merchants and out of a desire to not lose tenant/merchants, The Barn LLC accepted these suggestions and eventually implemented the tenant/merchants' requested policies and procedures. The original policies and procedures were provided by the tenant/merchants. Subsequently, The Barn LLC has taken over

drafting the policies and procedures, adding policies suggested by the tenant/merchants (this includes changing policies that the tenants did not like).

30. Plaintiff has participated in this process. She reviewed an early draft and sent an email indicating her approval. She has requested policies to be added (as a result of feedback from tenants/merchants) and The Barn has accepted her policy requests.

31. The Barn does not need a policy and procedural manual. It operated, under current management, from 1998 until 2012 without one. Plaintiff participated in the creation, review and expansion of the policy and procedural manual. She has now weaponized the manual trying to use it, contrary to her past views of the manual, to claim that she is an "employee" because the manual has "requirements" that "control" her when she is operating the cash register selling her own merchandise and merchandise of the other tenants. The Barn has contemplated a complete elimination of the manual; however, current tenants/merchants have indicated that a lack of a Policy and Procedural Manual would be problematic. In fact, a lack of policies and procedures would ruin their business, reduce their freedom to operate their business elsewhere and may result in them leaving The Barn.

32. In 2012, The Barn offered to increase Plaintiff's (and other tenant/merchants) rent – from a 3% commission payment to 15% - in order to hire sales staff to assist the merchants. Most tenants/merchants, including Plaintiff declined the offer. They desired reduced rent (3% commission rather than 15%) and to work the cash registers themselves.

33. As a result of this decision by most tenants/merchants, including Plaintiff, the tenant/merchants have enjoyed reduced rent.

### PLAINTIFF'S CLAIM THAT WHEN SHE OPERATED CASH REGISTER SELLING HER AND OTHER TENANT/MERCHANT INVENTORY MADE HER AN EMPLOYEE OF THE BARN LLC, M AND R ENTERPRISES AND CATHERINE HAIGH

34. Plaintiff contends that she was an "employee" when she operated the cash register.

35. Plaintiff admitted in her deposition and in her undisputed statement of facts that when at the cash register, she sold her and other tenant/merchant inventory. She did not work for The Barn LLC and therefore was not paid any wages. None of the tenants are employees. None of them have requested payment for their time at the cash register when they sell their merchandise and the merchandise of the other tenants.

36. Prior to her lawsuit, Plaintiff never claimed to be an employee.

37. She filed tax returns claiming that she was a business and claimed business expenses deductions from her gross sales.

38. She was audited by the IRS. The IRS challenged some of her business deductions.

39. She retained a tax lawyer/accountant who successfully defended her challenged business expenses deductions.

40. Prior to retaining her tax lawyer/accountant, Plaintiff asked Gary Traylor, a financial service provider for The Barn LLC, to contact her (IRS) auditor and tell the auditor that she was not an employee of The Barn LLC.

41. Plaintiff had a sales tax license.

42. Plaintiff claims she was "employed" because she was a shift leader.

43. The concept of shift leader originated with the tenants/merchants. The tenant/merchants believed that one or more of the workers covering the cash register should be "leaders." Again, it made no difference to The Barn LLC whether the tenants/merchants "supervised" each other as The Barn had operated without "shift leaders" since 1998. The Barn LLC acquiesced to the tenant/merchants' request and the tenants designated some tenant/merchants as shift leaders.

44. The shift leaders would coordinate among themselves their days to operate the cash register and were available to help if situations other tenants if problems arose during the days that needed a more experienced Tenant/Merchant to help handle.

45. The Barn LLC did not supervise the shift leaders. This was entirely a creation of the tenants. They created their own rules and coordinated the services among themselves.

46. Plaintiff begged to be a "shift leader" At this point in time, Plaintiff had become a problematic tenant/merchant. She was not a good neighbor to her fellow tenants/merchants and complaints began to surface regarding her behavior.

47. Plaintiff was not required to do anything. She was a month-to-month tenant who volunteered to be a shift leader. As a month-to-month tenant she was free to leave or decline to follow the policies and procedures that she and the other tenant/merchants requested. Moreover, as a month-to-month tenant, The Barn LLC could have evicted Plaintiff for any reason regardless of whether she followed the tenant/merchant driven policies and procedures. Similarly, the policies and procedures do not prohibit a tenant/merchant from declining to work at the cash register or from setting up a tenant/merchants own cash register in each's individual space (which would have required each to spend all day each day at The Barn in order to sell each's merchandise).

48. The Policy and Procedures are guidelines created by the tenants to create uniformity among the tenant's conduct while operating the cash register. The Policy and Procedures are guidelines created by the tenants to create uniformity among the tenant's conduct while operating the cash register. The duties and responsibilities in the PPM all benefit the tenants. These policies are a result of the tenants' request in order to promote their individual businesses. Moreover, their efforts at The Barn are predominantly for their benefit. For example, when a tenant closes the cash register, counts money, runs POS reports, completes deposit slips and tidies The Barn, that tenant is predominantly benefitting itself and the other tenants. The Barn LLC receives rent. The commercial building could be used for other purposes and still generate rent. The tenants' occupancy and services while leasing retail space at The Barn predominantly benefits the tenants and are for the tenants.

6

ATTACHMENT F
OSUMF
6

49. None of the tenants provide any management or lessor/lessee services for or on behalf of The Barn LLC. The Barn LLC and its sole managing member exclusively handle the property management issues (with assistance from its independent contractor).

50. A review of the point-of-sales software system and Plaintiff's financial records produced in response to The Barn LLC's discovery requests, reflects that Plaintiff did not participate in operating the cash register as she had agreed. In her lease agreement, she was to operate a cash register for six days a month until February 2017 where she was to operate a cash register for 8.5 days a month. The following Table reflects her actual days at the case register:

51. Plaintiff wrongly asserts that she was always required and/or suggested that she has worked 8.5 days a month. She also wrongly asserted that she worked every black Friday and small business Saturday. These assertions are not true. The following table reflects her agreed upon days at the cash register and the actual days she operated the cash register.

| Year | Month | Agreed upon days at Cash Register | Actual Days at Cash Register |
|---|---|---|---|
| 2015 | September | 6 | 4 |
| 2015 | October | 6 | 4 |
| 2015 | November | 6 | 4 |
| 2015 | December | 6 | 3 |
| 2016 | January | 6 | 4 |
| 2016 | February | 6 | 5 |
| 2016 | March | 6 | 4 |
| 2016 | April | 6 | 3 |
| 2016 | May | 6 | 3 |
| 2016 | June | 6 | 4.5 |
| 2016 | July | 6 | 4 |
| 2016 | August | 6 | 1 |
| 2016 | September | 6 | 2 |
| 2016 | October | 6 | 3 |
| 2016 | November | 6 | 5.5 |
| 2016 | December | 6 | 4 |
| 2017 | January | 6 | 3 |
| 2017 | February | 8.5 | 4 |
| 2017 | March | 8.5 | 4 |
| 2017 | April | 8.5 | 4 |
| 2017 | May | 8.5 | 3.5 |
| 2017 | June | 8.5 | 4 |
| 2017 | July | 8.5 | 4.5 |
| 2017 | August | 8.5 | 4.5 |
| 2017 | September | 8.5 | 3 |
| 2017 | October | 8.5 | 6 |
| 2017 | November | 8.5 | 6 |

ATTACHMENT F
OSUMF
7

| 2017 | December | 8.5 | 4 |
|---|---|---|---|
| 2018 | January | 8.5 | 3 |
| 2018 | February | 8.5 | 4 |
| 2018 | March | 8.5 | 4 |
| 2018 | April | 8.5 | 3 |
| 2018 | May | 8.5 | 4 |
| **Totals** | | **238** | **126.5** |

52. The days Plaintiff appeared at the cash register was nearly half of the days she had agreed. She hired other people to cover the cash register for her. She claimed that I appeared at a meeting in 2013 and required her to hire my son. I have never required plaintiff or other merchants to hire my son. I do not recall appearing at a meeting in 2013. It is rare that I personally appear at The Barn. I have lived out of state since 2012. The following table shows the actual days Plaintiff was at the cash register compared to the days she agreed to operate the cash register.

Yearly totals

| Year | Total Days at Cash Register |
|---|---|
| 2015 | 15 days |
| 2016 | 43 days |
| 2017 | 50.5 days |
| 2018 | 18 days |
| **Total days during 3 year period** | 126.5/238 (= 53%) |

53. Plaintiff significantly benefitted from her choice to pay reduced rent and decline a sales staff as offered by The Barn LLC in 2012.

54. In 2012, the Barn LLC proposed increasing the rent commission (each tenant/merchant pays a commission of their sales as part of rent and at the time the percentage was 3%) to 15% in order to retain a sales staff. The Barn LLC offered two choices to the tenant/merchants: (1) continue the cooperative arrangement to cover the cash register as had been followed in the past; or (2) pay 15% rent commission in order for The Barn LLC to hire sales staff. Plaintiff and the majority of other tenants requested that they continue their cooperative arrangement.

55. The table below reflects the difference in commissions Plaintiff paid for the last four years pursuant to the agreement to not raise the rent commission payment to 15% (the commission payment was raised by 2% to 5% to keep up with market rates).

| Year | Plaintiff's Total Sales | 5% Paid by Plaintiff | 15% Plaintiff would have paid if she accepted The Barn LLC's offer in 2013 | Difference between 5% and 15% |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 2015 | $203,229.00 | $10,161.45 | $30,484.35 | $20,322.90 |
| 2016 | $196,775.28 | $9,838.76 | $29,516.29 | $19,677.53 |
| 2017 | $264,825.32 | $13,241.27 | $39,723.80 | $26,482.53 |
| 2018 | $95,927.67 | $4,796.38 | $14,389.15 | $9,592.77 |
| **Totals** | 760,757.27 | 38,037.86 | 114,113.59 | $76,075.73 |

56. This table reflects that by keeping the rent commission at the reduced rate, rather than increase the rent commission to 15% to hire a sales staff, Plaintiff was compensated by paying $76,075.73 less since 2015 instead of paying $76,075.32 more over the same time period to The Barn LLC in additional rent.

### PLAINTIFF'S DIFFICULTIES IN WORKING WITH OTHER TENANT/MERCHANTS AND DISCONTINUATION OF HER MONTH-TO-MONTH TENANCY

57. As it turned out, the efforts to give Plaintiff what she wanted only exacerbated her citizenship issues as she used her shift leader position to bully other tenant/merchants. Plaintiff has a temper problem, this was on display often while at The Barn and reflected during her deposition as she was asked to de-escalate her temper on several occasions. She presented as a difficult deponent who became combative, angry and at times refused to cooperate with questions presented to her. At The Barn, she was mean to other tenant/merchants, particularly with another whose sexual orientation appeared to not meet with Plaintiff's approval. Plaintiff increasingly became a problem and as a result her month-to-month tenancy was not renewed by The Barn LLC as of June 2018.

58. Plaintiff is a contentious individual (she was asked several times during her deposition to calm down and answer question) who was increasingly not getting along with other tenants. The Barn LLC had lost a tenant as a result of Plaintiff's behavior and learned that Plaintiff had been bullying another tenant making derogatory remarks about his sexual orientation and reporting to The Barn that he was leaving his HIV medication "on the floor where children could pick it up."

59. Rather than complete her tenancy at The Barn LLC, Plaintiff left The Barn in May 2018. She originally claimed in her deposition that she left "voluntarily" and then later claimed she was evicted. The Barn LLC maintains that Plaintiff's tenancy was terminated as of June 30, 2018 as a result of misconduct (anger management issues, poor citizenship and failure to treat other tenant/merchants respectfully). Plaintiff's anger management was not limited to her alone. A few days after she left The Barn, her husband appeared (with the police) and became hostile towards tenant/merchants at The Barn.

60. Approximately one month after leaving The Barn, Plaintiff sent a demand letter insisting that she was an "employee" and owed "wages." In the eight years she was a tenant/merchant at The Barn, Plaintiff never informed The Barn LLC that she believed she was an "employee." She never demanded wages. In fact, a few years ago, she was audited by the IRS who challenged some of the business deductions she claimed for Sunday Afternoon and she

9

requested Gary Traylor – another individual who had provided financial services to The Barn LLC – to speak with her auditor and to tell her auditor that she was not an employee.

61. She participated in the creation and implementation of the Policy and Procedure Manual.

62. Plaintiff was queried about the IRS audit during her deposition. She refused to acknowledge that she successfully demonstrated to the IRS that she was not an employee of The Barn LLC.

63. Her demand letter seemed strange as it was entirely inconsistent with the relationship she had with The Barn LLC and at odds with her claims in her IRS audit. Moreover, she had never requested wages in the eight years that she was a tenant at The Barn. In fact, The Barn has been under current management for nearly 21 years, with tenants operating the cash register, and has never had a tenant claim s/he was an "employee."

64. Exhibits O, P, Q and R attached to my response to Plaintiff's motion for summary judgment is a true and accurate copy of emails I sent and/or received to/from the tenants.

*I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.*

Dated this 18th day of October 2019.

_____
Catherine Haigh